# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND
# SOUTHERN DIVISION

WARREN A. STORRS,

   Plaintiff,

vs.                Civil Action No. AW-07-2025

JEROME A. ALLEN, *et al.*,

   Defendants.

\*\*\*\*\*\*

## MEMORANDUM OPINION

Pending before the Court is Plaintiff's Motion to Quash Subpoena and for Protective Order (Doc. No. 63); Plaintiff's Motion for Reconsideration and Extension of Discovery Deadline (Doc. No. 64); and Defendant, American Mortgage Company's, Motion for Summary Judgment (Doc. No. 70). The Court held a hearing on the pending motions on May 3, 2010. For the reasons articulated at the hearing and further discussed below, the Court denies as moot Plaintiff's Motion to Quash and for Protective Order, denies Plaintiff's Motion for Reconsideration, and grants Defendant's Motion for Summary Judgment.

## FACTUAL BACKGROUND

Plaintiff Warren Storrs ("Storrs") owned real property in Washington DC ("DC property"), and Defendant, Jerome A. Allen ("Allen"), owned real property in Waldorf MD ("Waldorf property"). They transferred interests in their separately owned property to one another, thereby becoming joint owners of both properties in early 2004,[1] and then participated in a commitment ceremony on April 17, 2004. Prior to the ceremony, Storrs and Allen decided

---

[1] During the transfer of the properties from sole ownership to joint ownership, Storrs became a co-borrower on the mortgage loan for the Waldorf property, but Allen did not become a co-borrower on the mortgage loan for the DC property. Furthermore, Storrs used money from the refinancing of the DC property as a down payment for the purchase of two vehicles.

to reside in the Waldorf property, which was originally owned solely by Allen. After a dispute, the parties' relationship ended, and Storrs moved out of the Waldorf property. The parties then began to engage in conversations to divide their assets, which included the real property as well as two vehicles purchased with money obtained from refinancing the DC property. On September 8, 2004, Storrs sent a letter to Allen, through his attorney, Iris Green ("Green"), proposing, *inter alia*, a sale of the Waldorf property, which would have entitled Storrs to recover a portion of the proceeds from the equity accumulated on the property since they became joint owners. Not wanting to sell the property, Allen chose to refinance the mortgage on the Waldorf property, an option suggested in the letter as a means to terminate Storrs' obligations on the mortgage and to "buy-out" Storrs' interest. Thus, shortly after receiving the letter Allen contacted Defendant, Ameriquest Mortgage Company ("AMC"), to refinance the Waldorf property.

Allen spoke with Steven Loya ("Loya"), an AMC representative, about refinancing the Waldorf property. According to Allen's deposition testimony, he told Loya that Storrs was trying to take his house and that he needed to get the property back in his name only. Then the two discussed the process for refinancing the property, specifically the documentation needed, such as an application and proof of income. Loya testified in his deposition that he did not recall having conversations with Allen, or that he otherwise could not remember the specifics of any such conversation. Allen asserted throughout his deposition testimony that he did not discuss the quitclaim deed with Loya. At some point thereafter, it is alleged that Storrs' counsel, Green, contacted Allen, and Allen informed Green that he was closing on the refinance of the Waldorf property in two (2) days. After informing Storrs of the refinancing, Green then told Allen that Storrs requested an appraisal for the value of the Waldorf property, which Allen refused to

2

provide. Green also informed Allen that Storrs refused to sign the quitclaim deed without Allen agreeing to transfer the DC property back into the sole ownership of Storrs, repaying the deposit on a vehicle purchased for Allen with money that Storrs obtained from refinancing the DC property, and various other conditions. Storrs alleges that he spoke with Loya about his refusal to sign a quitclaim deed unless his conditions were met. In fact, Loya faxed Plaintiff's counsel the quitclaim deed on September 24, 2004, after Plaintiff allegedly inquired about the refinancing, although Loya did not recall sending the fax or speaking with Plaintiff. Apparently, Allen needed the quitclaim deed in order to refinance the jointly owned property in his name only.

Despite Storrs' objection to signing the quitclaim deed, Allen proceeded with the closing of the refinance loan. According to Allen's deposition testimony, he spoke with Regina Northcross ("Northcross"),[2] an employee of Pinnacle Settlement Services, Inc. ("PSSI"), and explained to her the situation with Storrs. Allen claims that Northcross was compassionate about his dilemma and offered to help him. Allen then asserted that he went to PSSI's office in Greenbelt, Maryland, on September 23, 2004, alone and met Northcross in the lobby. According to Allen, Northcross left him alone in the lobby, at some point she provided him with a blank copy of the quitclaim deed, and then left him alone in the lobby with the blank form while she retrieved Defendant Keisha McKoy ("McKoy"). Allen then admitted to filling out the blank portions of the quitclaim deed, including forging the signature of Storrs. Northcross then allegedly returned to the lobby with McKoy who notarized the quitclaim deed on which Allen had forged Storrs' signature, despite the absence of Storrs at the notarization.

---

[2] The exhibits reflect that Northcross notarized the Deed of Conveyance, transferring the Waldorf property into a joint ownership on January 9, 2004.

Also on September 23, 2004, Theresta Lainer ("Lainer"), a closing agent[3] of ATM Corporation of America ("ATM"), signed a closing agent affidavit certifying that the loan documents were properly signed, dated, and notarized as well as that the appropriate disclosures were provided to Allen.[4] AMC hired ATM as the title company for the closing of the refinance of the Waldorf property. Lainer testified during her deposition that she could not recall closing Allen's refinance loan or where any such closing had taken place. She acknowledged, however, that she most likely conducted the closing because her signature appears on the documents. Lainer also explained that she remembered a man coming to her house around midnight to close on a loan, which she refused to do because the man did not have with him the other individual needed to sign the documentation. Moreover, Lainer claims that she did not recall getting a copy of the title record report, which would have indicated that Allen and Storrs owned the property jointly. After AMC received the papers from Lanier certifying the closing of the loan, another AMC employee, Brent Tatum, issued the Deed of Trust on September 29, 2004, in which the property was titled in Defendant Allen's name only. Defendant Allen, then allegedly called Loya to thank him for his help in the refinancing.

Storrs alleges that he discovered that the Waldorf property had been titled solely in Allen's name around December 2004. He filed his complaint in this Court on July 30, 2007. After a hearing on AMC'S Motion to Dismiss, held on December 3, 2008, the Court dismissed several counts in the complaint against AMC. The only remaining counts against AMC are conspiracy to defraud and fraudulent transfer.

---

[3] AMC describes Lainer as an agent for ATM; however, in the hearing Plaintiff indicated that Lainer was hired as an independent contractor by AMC. Lainer testified in her deposition that she was not directly employed with ATM, although she admitted that it was possible that ATM assigned her to the transaction because she had previously registered with several companies to serve as a closing agent.

[4] The record did not make clear whether Defendant Allen went to Lainer or PSSI first.

# MOTION FOR RECONSIDERATION
# AND EXTENSION OF DISCOVERY DEADLINE

In the Fourth Circuit, a Court can amend an earlier judgment: "(1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." *Hutchinson v. Stanton*, 994 F.2d 1076, 1081 (4th Cir. 2002). Reconsideration is, however, an extraordinary remedy. *Pac. Ins. Co. v. Am.. Nat'l Fire Ins. Co.,* 148 F.3d 396, 403 (4th Cir. 1998). Moreover, the Fourth Circuit explained that courts may grant motions for extension of discovery "only 'upon a showing that the parties diligently have pursued, and have been unable to complete, discovery within the original period.'" *In re Heritage Vill. Church & Missonary Felllowship, Inc.*, No. 90-1552, 1991 WL 186844, *2 (4th Cir. 1991).

Pursuant to Rule 19(a) of the Federal Rules of Civil Procedure, a party must be joined if "in that person's absence, the court cannot accord complete relief among existing parties . . . ," unless the joining of the party would deprive the court of jurisdiction. Additionally, under Maryland law, an employer is vicariously liable for the tortious conduct of its employees under traditional respondeat superior principles, namely if the employee's conduct was within the scope of employment such that it was "in furtherance of the employer's business and [was] 'authorized' by the employer." *Sawyer v. Humphries*, 587 A.2d 467, 470 (Md. 1991). The court in *Sawyer*, explained that "'to be within the scope of employment the conduct must be of the kind the servant is employed to perform,'" must occur during the time period and locality not "unreasonably [disconnected] from the authorized area [or time], and [be] actuated at least in part by a purpose to serve the master.'" *Id.* at 471. The court further emphasized that authorized does not mean authority "expressly conferred, but [depends on] whether the act was such that it

5

was incident to the performance of the duties entrusted to him by the master, even though in opposition to his express and positive orders." *Id.* at 470 (citations omitted).

Here, Plaintiff moved for joinder of PSSI as a party in this action on May 26, 2009. In his initial motion for joinder, Plaintiff stated as grounds for the addition of PSSI as a party that Northcross, an employee of PSSI, had been compassionate about Allen's situation and left him in the lobby to fill out the form and Keisha McKoy, another PSSI employee, notarized the quitclaim deed. The Court denied Plaintiff's motion in an Order dated August 20, 2009, stating that Northcross' expression of compassion towards Allen was insufficient to make PSSI a necessary party. The Plaintiff now asks this Court to reconsider its Order because the Court overlooked that two employees of PSSI actually helped facilitate the forgery of the quitclaim deed.

First, Plaintiff claims that according to Allen's deposition testimony, Northcross was not only compassionate about Allen's situation, but also offered to help him. Second, Plaintiff points to Allen's deposition testimony in which he explained that after he spoke with Northcross about helping him, Allen went to PSSI's office alone and Northcross provided him with the blank quitclaim deed. She then left him alone in the lobby with the blank quitclaim deed and returned with McKoy to notarize it. Moreover, Plaintiff emphasizes that McKoy notarized the quitclaim deed, which included Plaintiff's signature, despite the absence of Plaintiff during the notarization. Thus, Plaintiff points to all of these facts as evidence that the two PSSI employees participated in the scheme to forge the quitclaim deed and to defraud Plaintiff of his interest in the property. Defendant counters that Plaintiff's motion was untimely, because it was filed one day after the deadline for filing motions for reconsideration. Moreover, Defendant argues that Plaintiff deposed Northcross, who testified that she did not recall the events that Allen testified to

6

involving the notarization of the quitclaim deed at issue, and thus there is an insufficient factual basis to hold PSSI liable.

As the Court articulated in the hearing, it sees no basis to join PSSI as a party in this matter on the facts alleged. The Court notes that all of the allegations against Northcross and McKoy are based solely on the deposition testimony of Allen, who testified about several questionable occurrences, such as stating that the closing occurred at PSSI when the record reflects that no such closing took place at PSSI. Both parties and the Court acknowledged that Allen has admitted that he forged the quitclaim deed and that his testimony is largely untrustworthy. The Court finds Allen's deposition testimony simply insufficient to serve as the sole basis for holding PSSI liable as a party. Furthermore, although there is some evidence to suggest that Northcross and McKoy may have been employed at PSSI at the time of the alleged incident, possibly serving as notaries, the Court does not believe that there is sufficient evidence to show that the notarization of the quitclaim deed, supposedly in the lobby, was to further the business interest of PSSI. As made clear at the hearing, PSSI was not hired to handle any aspect of the loan refinancing in question although it had previously assisted in the closing of the prior refinancing in which the parties became joint owners of the Waldorf property. Therefore, without a showing that the alleged acts of the two PSSI employees were done to further PSSI's business interest, the Court upholds its decision to deny joinder of PSSI as a party in this case. Accordingly, Plaintiff's Motion for Reconsideration is denied.

Plaintiff is also seeking additional time to conduct further discovery on ATM, but as the Court explained at the hearing, Plaintiff did not clearly explain or provide a sufficient proffer as to how any information discovered from this entity would support any of his claims against AMC. Furthermore, the Court agrees with Defendant that Plaintiff has had sufficient

opportunity to seek discovery from ATM within the deadline set for completion of discovery. Therefore, the Court denies Plaintiff's request for additional discovery.

**MOTION FOR SUMMARY JUDGMENT**

Summary judgment is only appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). The Court must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded to particular evidence." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). To defeat a motion for summary judgment, the nonmoving party must come forward with affidavits or other similar evidence to show that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). While the evidence of the nonmoving party is to be believed and all justifiable inferences drawn in his or her favor, a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences. *See Deans v. CSX Transp., Inc.*, 152 F.3d 326, 330-31 (4th Cir. 1998). Additionally, hearsay statements or conclusory statements with no evidentiary basis cannot support or defeat a motion for summary judgment. *See Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro*, 64 F.3d 962, 967 (4th Cir. 1995).

**I.  Conspiracy to Defraud**

Plaintiff has sued AMC for conspiracy to defraud and fraudulent transfer and conversion of property. Under Maryland law, "'a civil conspiracy is a combination of two or more persons by an agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal,'" that results in damage to Plaintiff. *Hill v. Brush Eng'g*

8

*Materials, Inc.*, 383 F. Supp. 2d 814, 821 (D. Md. 2005) (citations omitted). Thus, the essential elements are: "(1) an agreement, understanding, or confederation to accomplish an unlawful act or to use unlawful means, (2) an unlawful act done in furtherance of the conspiracy, and (3) actual legal damage." *Koffman v. Osteoimplant Tech. Inc.*, 182 B.R. 115, 121 (D. Md 1995). Maryland law requires that a conspiracy claim must rely on some underlying tort that causes injury to the plaintiff. *Hill*, 383 F. Supp. 2d at 821. Moreover, "'independent acts of two wrongdoers do not make a conspiracy.'" *Id.* (citations omitted). However, there must be a "unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement." *Cavalier Mobile Homes, Inc. v. Liberty Homes, Inc.*, 454 A.2d 367, 372 (Md. Ct. Spec. App. 1983).

AMC argues that there is no conspiracy to defraud, because Defendant Allen's deposition testimony shows that he acted independently, at least without any involvement by AMC, when he forged Plaintiff's signature on the quitclaim deed. According to Allen's deposition testimony, he did not discuss the quitclaim deed with any employee of AMC, except that he alleged in his first conversation with Loya about refinancing the property he mentioned that he needed to get the property back in his name only. Moreover, there is no evidence that AMC knew that the quitclaim deed had a forged signature when Tatum, another employee of AMC, issued the Deed of Trust solely in Allen's name. Plaintiff attempts to show that AMC participated, aided, or had an understanding with Allen to forge Storrs' name on the quitclaim deed because Storrs discussed with Loya that he would not sign the quitclaim deed unless certain conditions were met. Moreover, Plaintiff points to the fact that Loya faxed Plaintiff the quitclaim deed, albeit a day after the closing on the refinance loan, as further evidence that AMC was part of the conspiracy to defraud and was attempting to get a valid quitclaim deed. Plaintiff also alleges that

9

the relationship that Allen built with Loya during the refinancing of the property, as well as, Allen calling to thank Loya after the closing shows that AMC is part of the conspiracy. At the hearing, Plaintiff also argued that Defendant AMC had to know what was going on because it did not process this refinancing loan "according to the book"; ignored, by-passed, or failed to comply with its regular closing instructions; and that there are too many questions about protocol that should have been followed but was not. Specifically, Plaintiff alleges that AMC disregarded the caution by ATM in the title report that further assurances were needed to transfer the property back into the sole ownership of Allen and permitted the quitclaim deed to be notarized by an individual who was not the closing agent. Plaintiff argues that AMC's failure to follow its own procedures at least shows that its actions were in concert with Allen's forgery.

As the Court explained at the hearing, there is simply an insufficient basis to hold AMC liable for conspiracy to defraud in this case. As Defendant AMC points out, there is no evidence that Allen communicated or otherwise indicated his intention to forge Plaintiff's signature on the quitclaim deed. In fact, Defendant Allen testified that he never discussed the quitclaim deed with any employee or agent of AMC. Moreover, it appears that Allen, on his own, sought the assistance of individuals not hired to help facilitate the closing of the refinance loan in order to obtain the forged quitclaim deed. In addition, although AMC's agent, Loya, faxed an unexecuted copy of the quitclaim deed to Plaintiff's attorney the day after closing occurred on the refinancing loan, there is no evidence, other than Plaintiff's speculation, to support that Loya or anyone else at AMC knew that the quitclaim deed was forged. Even if the Court accepts Plaintiff's speculation that Loya's faxing of an unexecuted quitclaim deed demonstrates that AMC was aware of the forgery, any such attempt to obtain a valid quitclaim deed seems to suggest that AMC did not want a fraudulent quitclaim deed and thus did not conspire with Allen

to defraud the Plaintiff. Lastly, as the Court previously indicated, there is nothing in the record nor has there been any evidence developed during extensive discovery, including taking several depositions of AMC's agents in California and Washington, D.C., that shows AMC had any knowledge that Allen forged Plaintiff's signature on the quitclaim deed. If anything, AMC's failure to follow its own protocol may indicate negligence or oversight, but it does not support Plaintiff's contention that AMC participated in a conspiracy with any other individual to defraud Plaintiff. Beyond what appears to be the individual, surreptitious, and fraudulent actions of Allen, possibly assisted by Defendant McKoy who allegedly notarized the quitclaim deed in a lobby, there is simply no evidence to link AMC to a conspiracy to defraud Plaintiff. Therefore, the Court grants summary judgment with respect to the conspiracy to defraud claim.

## II. Fraudulent Transfer and Conversion of Property

In its Order on AMC's Motion to Dismiss, the Court explained that a conversion claim is not applicable to real property, and thus there is no viable conversion claim in this matter. Moreover, a claim for fraudulent transfer or fraudulent conveyance is a claim that a debtor transferred property with the intent to defraud creditors. *See Frain v. Perry*, 609 A.2d 379, 386 (Md. 1992) ("The law governing conveyances to defraud creditors is found in Md. Com. Law II Code Ann. §§ 15-201 through 15-214 . . . ."). There is no allegation that Plaintiff is a creditor of Defendant Allen, and thus a claim for fraudulent transfer appears is inapplicable to these facts.

Nevertheless, Defendant AMC, in its Motion for Summary Judgment suggested that this claim could be interpreted as a claim for common law fraud. Defendant AMC then analyzed the claim as if it were a claim for fraudulent misrepresentation. Under Maryland law, fraudulent misrepresentation requires a showing that : (1) the defendant made a false representation; (2) the defendant knew of its falsity or acted with reckless indifference to its truth; (3) the defendant made the representation with the intent to defraud plaintiff; (4) the plaintiff relied upon the

11

misrepresentation; and (5) the plaintiff suffered an injury because of the misrepresentation. *Goldstein v. Miles*, 859 A.2d 313, 331 (Md. Ct. Spec. App. 2004). As AMC argued, the evidence does not show that AMC knew that the quitclaim deed was forged when it issued the Deed of Trust solely in Defendant Allen's name. As discussed above, Allen did not discuss or indicate an intention to forge the quitclaim deed with anyone at AMC. Furthermore, to the extent that Plaintiff alleges that AMC failed to follow its own protocol in this situation, such as not ensuring that the closing agent served as the notary on all documents associated with this refinancing, the Court finds that this failure does not indicate that AMC intended to defraud Plaintiff. At best, this evidence shows that AMC may have be negligent or otherwise made some mistakes. Plaintiff's argument as to this count appears to repeat his allegation that AMC participated in a conspiracy with Defendant Allen. As the Court has found that the conspiracy to defraud claim is not cognizable against AMC, and considering that Plaintiff has not offered any other interpretation of what he is alleging in this count, the Court grants AMC summary judgment as to the fraudulent transfer claim.

## **MOTION TO QUASH SUBPOENA AND FOR PROTECTIVE ORDER**

AMC attempted to depose Plaintiff's counsel, Green, arguing that because Green had prepared the letter sent to Allen discussing Storrs' proposals for disposing of the property and communicated with Loya about the refinancing that she had pertinent information about the facts in this case. Plaintiff's counsel then filed the pending Motion to Quash Subpoena or for Protective Order to prevent the taking of her deposition. In light of the Court's decision to grant AMC's Motion for Summary Judgment, the Court denies this motion as moot.

## CONCLUSION

For the reasons articulated at the hearing and further discussed above, the Court denies as moot Plaintiff's Motion to Quash Subpoena and for Protective Order (Doc. No. 63); denies Plaintiff's Motion for Reconsideration and to Extend the Discovery Deadline (Doc. No. 64); and grants Defendant AMC's, Motion for Summary Judgment (Doc. No. 70).

May 6, 2010                          /s/
  Date                                Alexander Williams, Jr.
                                      United States District Court Judge